**OUTDOOR SYSTEMS INC.**

**v.**

**CITY OF ATLANTA, a political subdivision of the State of Georgia.**

**Civ. No. 1:94–CV–3038–WCO.**

United States District Court,
N.D. Georgia,
Atlanta Division.

May 1, 1995.

David H. Flint, Mark W. Forsling, Schreeder, Wheeler & Flint, Atlanta, GA, for plaintiff.

David D. Blum, Joe M. Harris, Jr., Robert L. Zoeckler, Office of Atlanta City Atty., Atlanta, GA, for defendant.

***ORDER***

O'KELLEY, District Judge.

The captioned case is before the court for consideration of plaintiff's motion for a preliminary injunction. The parties have agreed to an accelerated determination of the merits of this case, and therefore the court will treat this matter as a ruling on a motion for a permanent injunction.

***FACTS***

Plaintiff owns and leases numerous parcels of real property throughout the City of Atlanta, upon which it maintains outdoor advertising signs. The messages on the signs are changed periodically and serve as advertisements for a wide variety of entities and events.

The case at bar involves a challenge to the City of Atlanta 1994 Sign Ordinance ("1994 Sign Ordinance"), enacted August 19, 1994, and to the ordinance enacted on October 10, 1994, imposing interim controls for additional signs to be posted for a limited time in conjunction with the 1996 Centennial Olympic Games ("Olympic Sign Ordinance"). Plaintiff alleges that the ordinances violate, *inter alia,* the First Amendment to the United States Constitution.

The essence of the Olympic Sign Ordinance is the creation of a five member committee. The committee is charged with recommending "Concentrated Sign Districts" within the City of Atlanta. Signs not in compliance with the Ordinances are banned. The committee is also empowered to grant

permits to those desiring to erect signs pursuant to the Olympic Sign Ordinance. Only those signs which in some way promote an Olympic or Olympic-related event will be permitted. Plaintiff argues that this is a content-based restriction on expression, violative of the First Amendment.

In contrast with the narrowly focussed purview of the Olympic Sign Ordinance, the 1994 Sign Ordinance is a comprehensive regulatory framework for the posting of all signs within the City of Atlanta. As noted, plaintiff contends that the 1994 Sign Ordinance violates the First Amendment, as well as the Equal Protection Clause of the Fourteenth Amendment and certain state constitutional provisions.

This court entered temporary restraining orders enjoining the enforcement of both statutes until the full merits of the case could be adjudicated. On February 24, 1995, both sides were afforded the opportunity to present oral argument to the court.

Lastly, additional facts, particularly relevant excerpts from the two statutes, shall be set forth in the sections providing a legal analysis of each statute. It is significant to emphasize that these are two distinct, albeit somewhat interrelated, ordinances and, accordingly, shall be considered as such.

## *LEGAL ANALYSIS*

### I. *The Olympic Sign Ordinance*

Plaintiff contends that the Olympic Sign Ordinance is repugnant to the First Amendment of the United States Constitution. Specifically, plaintiff points toward §§ 3(A) and 7 of the Olympic Sign Ordinance. The former section establishes a body known as the Interim Sign Review Committee ("Committee"). The Committee is comprised of five individuals.[1] The Committee's mission is to "review applications for all signs provided for by this ordinance and to determine compliance with the standards and criteria set forth herein." Olympic Sign Ordinance at § 3(A). The Committee is further empowered to recommend "Concentrated Sign Districts" within the parameters of the City of Atlanta in either commercial or industrial zones. *Id.* at § 3(B). It is only within these Concentrated Sign Districts that signs erected pursuant to the Olympic Sign Ordinance may be placed. The signs will be permitted to remain for only a limited period, from February 1 to October 31, 1996. *Id.* at § 7(B)(8).

Section 7 of the Olympic Sign Ordinance delineates the requirements for those signs which the Committee may permit to be constructed in a Concentrated Sign District. The requirements contain, *inter alia,* the following conditions:

(1) The existence of the sign is brought about as a result of the location of the Games or Paralympic Games in 1996 in the City and the sign promotes some activity related to the Games or Paralympic Games.

(2) No more than twenty percent (20%) of the sign area, per sign, shall contain a commercial message.

* * * * * *

(10) All signs pursuant to this Section 7 may be located only in nonresidential zones.

Olympic Sign Ordinance at § 7(B).

The language quoted from § 7(B) cannot be assessed accurately in a vacuum. Rather, although it is a distinct ordinance, the 1994 Sign Ordinance must be consulted for definitional purposes. That ordinance defines a "general advertising sign" as "[a] sign directing attention to a business, profession, product, service, activity, accommodation, attraction, or entertainment not principally conducted, sold or offered on the premises." 1994 Sign Ordinance at § 16–28A.004. That ordinance goes on to provide: "General ad-

1. The Committee membership consists of the following: one member appointed by the Mayor subject to City Council approval; one member appointed by the President of the City Council subject to City Council approval; one member appointed by the C.E.O. of the Atlanta Committee for the Olympic Games ("ACOG") subject to City Council approval; one member who is a sitting member of the City Council selected by the City Council; and one member shall be the chair of the Urban Design Commission or the chair's designee. The Committee shall cease to exist at midnight of August 31, 1996.

vertising signs are permitted only in the I-1 and I-2 Industrial Districts...." *Id.* at § 16-28A.007(2).

Notwithstanding the court's prior admonition that the two ordinances are distinct statutory creatures and to be treated as such, it is necessary to refer to the quoted portion of the 1994 Sign Ordinance in order to effectively analyze the First Amendment implications of the Olympic Sign Ordinance. In so doing, it is apparent that the Olympic Sign Ordinance carves out an exception for what would otherwise be "general advertising signs" and allows those within that exception to be placed in a commercial zoning district *if* that district has been designated as a Concentrated Sign District by the Committee. This is the gravamen of plaintiff's complaint: the Olympic Sign Ordinance provides a mechanism by which the Committee—a state actor as that term is understood in constitutional jurisprudence—can single out particular forms of expression for special treatment. Those favored forms of expression are those signs which promote, in some fashion, the Games or Paralympic Games. A qualifying sign is thus able to enjoy a benefit unavailable to a "general advertising sign," namely placement within a Concentrated Sign District. By definition, the Concentrated Sign Districts will be in commercially zoned areas, because were they in industrial areas, there would be no need for a special grant of permission. The designation of certain signs as eligible for this treatment based on their content, i.e., the promotion of an Olympic-related message, is fatal to the Olympic Sign Ordinance.

This requirement is a content-based restriction on speech. Only those signs containing an Olympic message are eligible for erection in the Concentrated Sign District.[2] It is undisputed that "above all else, the First Amendment means that government has no power to restrict expression because of its message, ideas, its subject matter, or its content." *Police Department of Chicago v. Mosley,* 408 U.S. 92, 95, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1972). While such government conduct raises concerns under the Equal Protection Clause of the Fourteenth Amendment as well, to the extent that it is favoring a particular type of expression over another, that issue is intimately connected with the First Amendment question. "Necessarily, then, under the Equal Protection Clause, not to mention the First Amendment itself, government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views." *Id.* at 96, 92 S.Ct. at 2290. Simply stated, "[s]elective exclusions from a public forum may not 'be based on content alone, and may not be justified by reference to content alone." *Id. See also, Carey v. Brown,* 447 U.S. 455, 461-63, 100 S.Ct. 2286, 2290-91, 65 L.Ed.2d 263 (1980).

Were the existence of a content-based regulation the sole determinant of the Olympic Sign Ordinance's constitutionality, there would be no need to inquire any further. However, all forms of expression or speech are not on equal footing in terms of constitutional protection. There is a definite hierarchy of speech evident throughout the annals of First Amendment jurisprudence. While the lines among the various genres of expression are not always clear, it is uncontroverted that political speech occupies the most protected zone while commercial speech is sub-

2. It is worth noting that this is a very select subset of general advertisers, inasmuch as the use of any Olympic reference in advertising is directly restricted by federal law. The relevant statute states:

> Without consent of the [U.S. Olympic Committee], any person who uses for the purpose of trade, to induce the sale of any goods or services ...
> (1) the symbol of the International Olympic Committee consisting of 5 interlocking rings;
> (2) the emblem of the Corporation ...
> (3) any trademark, trade name, sign, symbol, or insignia falsely representing association with, or authorization by, the International Olympic Committee or the Corporation; or
> (4) the words "Olympic," "Olympiad," "Citius Altius Fortius," or any combination or simulation thereof tending to cause confusion, to cause mistake, to deceive, or to falsely suggest a connection with the Corporation or Olympic activity;
> shall be subject to suit in a civil action by the Corporation....

36 U.S.C. § 380(a). The statute goes on to permit the U.S. Olympic Committee to authorize contributors and suppliers to use the items listed above in advertising. *Id.* at § 380(b).

ject to the greatest degree of regulation. The United States Supreme Court has held:

> To require a parity of constitutional protection for commercial and noncommercial speech alike could invite dilution, simply by a leveling process, of the force of the Amendment's guarantee with respect to the latter kind of speech. Rather than subject the First Amendment to such a devitalization, we instead have afforded commercial speech a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values, while allowing modes of regulation that might be impermissible in the realm of noncommercial expression.

*Ohralik v. Ohio State Bar Assoc.,* 436 U.S. 447, 456, 98 S.Ct. 1912, 1918, 56 L.Ed.2d 444 (1978). Insofar as a categorical classification is useful, it is clear that this case involves commercial speech. The expression at issue entails the renting of space on a billboard in order to post images and/or text advertising or promoting a certain service, product, or message.

The Supreme Court has carefully enunciated the governing inquiry for evaluating a restriction on commercial speech:

> The First Amendment's concern for commercial speech is based on the informational function of advertising. Consequently, there can be no constitutional objection to suppression of messages that do not accurately inform the public about lawful activity. **The government may ban forms of communication more likely to deceive the public than to inform it....**
>
> If the communication is neither misleading nor related to unlawful activity, the government's power is more circumscribed. The State must assert a substantial interest to be achieved by restrictions on commercial speech.... **First, the restriction must directly advance the state interest involved; the regulation may not be sustained if it provides only ineffective or remote support for the government's purpose. Second, if the governmental interest could be served as well by a more limited restriction on commercial speech, the excessive restrictions cannot survive.**

*Central Hudson Gas & Elec. v. Public Serv Comm'n,* 447 U.S. 557, 563–64, 100 S.Ct. 2343, 2350, 65 L.Ed.2d 341 (1980) (citations omitted) (emphasis added). *See also, Metromedia, Inc. v. San Diego,* 453 U.S. 490, 507, 101 S.Ct. 2882, 2892, 69 L.Ed.2d 800 (1981).

The first question, pursuant to the *Central Hudson* analysis, is whether the commercial speech at issue concerns lawful activity and is not misleading. The lawful nature of the putative expression on plaintiff's properties is not contested. Thus, this element is deemed to be satisfied.

The second question is whether the asserted governmental interest is substantial. *Central Hudson, supra,* 447 U.S. at 566, 100 S.Ct. at 2351. The City maintains that its interest lies in promoting and maintaining safe conditions for pedestrian and vehicular traffic and in assuring the aesthetic appeal of the City during the Olympic events. It has long been recognized that these are legitimate goals for a municipal entity and thus may serve as the basis for regulation of commercial advertisements. *Metromedia, supra,* 453 U.S. at 508, 101 S.Ct. at 2893 (*citing Railway Express Agency, Inc. v. New York,* 336 U.S. 106, 69 S.Ct. 463, 93 L.Ed. 533 (1949) (relating to traffic safety); *Penn Central Trans. Co. v. New York City,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978) (relating to esthetics)). In this case, the City seeks to implement these goals by allowing a limited number of billboards in otherwise prohibited areas. Accordingly, the court is satisfied that the Olympic Sign Ordinance is acceptable under this prong.

The third question posed by *Central Hudson,* provided that the first two are answered in the affirmative, is "whether the regulation directly advances the governmental interest asserted." *Central Hudson, supra,* 447 U.S. at 566, 100 S.Ct. at 2351. The City of Atlanta argues that the Olympic signs, restricted to Concentrated Sign Districts with a heavy population of residents and visitors, will "(1) provide adequate and relevant information to the unprecedented number of people in a safe and operational manner ... (2) enhance the City's visual character in an aesthetically attractive manner ... and (3) maintain, to

the maximum extent practicable during this interim period, safe operating conditions for pedestrians and vehicles. Defendant's Brief In Opposition to Plaintiff's Motion for Preliminary and Permanent Injunction at 29 (citations omitted). While the court is not entirely comfortable with the proposition that the Olympic Sign Ordinance advances the laudable interests cited by the City, the court will assume, *arguendo,* that the City has met its burden in this regard. The court is willing to entertain this assumption because a definitive resolution is not necessary in light of the City's inability to satisfy the fourth prong of the *Central Hudson* paradigm.

The fourth question, deemed the "critical inquiry" by the Supreme Court, *Central Hudson, supra,* at 569, 100 S.Ct. at 2353, is whether the Olympic Sign Ordinance is "more extensive than is necessary to serve [the articulated] interest." *Id.* at 566, 100 S.Ct. at 2351. The failure of the Olympic Ordinance to satisfy this question is fatal to the City's effort to preserve the viability of the Olympic Sign Ordinance. Neither the limited lifespan nor the restricted physical area of applicability of the ordinance is sufficient to cure its constitutional infirmities. Restricting the commercially zoned areas in which off-premises advertising signs may be posted is, standing alone, not problematic. What is unconstitutional, though, is further limiting the availability of those locations based strictly on the content of the message. For instance, assume hypothetically that the Committee were to designate twelve Concentrated Sign Districts in which the regular prohibition on general advertising signs in commercially zoned areas was to be lifted. Further suppose that only ten Olympic sponsors, or others eligible under the parameters of the Olympic Sign Ordinance, were to avail themselves of the opportunity to purchase that advertising space. Notwithstanding the availability of two open Concentrated Sign Districts, a member of the public could not purchase the space to place a sign that said "Stop Terrorism In America." Similarly, a commercial enterprise that is not an Olympic affiliate could not place a sign that states "Buy Our Widgets." By the very terms of the ordinance, the Committee is compelled to prescreen any putative advertiser for the proper content of its message. Even under the relaxed standards afforded to commercial speech, such a blatant content-based restriction cannot pass constitutional muster. The Court has never "suggested that the 'commonsense differences' between commercial speech and other speech justify relaxed scrutiny of restraints that suppress truthful, nondeceptive, noncoercive commercial speech." *Central Hudson, supra,* at 578, 100 S.Ct. at 2357 (Blackmun, J., concurring).

Accordingly, after careful consideration, the court finds that the Olympic Sign Ordinance is unconstitutional in that it violates the First and Fourteenth Amendments of the United States Constitution. In light of that finding, the court need not consider the other challenges raised by plaintiff.

## II. *The 1994 Sign Ordinance*

Plaintiff raises a series of challenges to the 1994 Sign Ordinance, under both federal and Georgia law. These challenges can be placed in certain broad categories: First and Fourteenth Amendment issues as to freedom of expression and equal protection issues; alleged violations of Georgia constitutional law; and linkage of the 1994 Sign Ordinance and the Olympic Sign Ordinance. Each category will be considered individually.

### A. *First and Fourteenth Amendment Issues*

Plaintiff's first argument is that the 1994 Sign Ordinance violates the holding of *Metromedia, Inc. v. City of San Diego,* 453 U.S. 490, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981). Justice White, writing for a plurality, observed:

> Billboards ... like other media of communication, combine communicative and noncommunicative aspects. As with other media, the government has legitimate interests in controlling the noncommunicative aspects of the medium ... but the First and Fourteenth Amendments foreclose a similar interest in controlling the communicative aspects. Because a regulation of the noncommunicative aspects often impinges to some degree on the communicative aspects, it has been necessary for the

> courts to reconcile the government's regulatory interests with the individual's right to expression.... Performance of this task requires a particularized inquiry into the nature of the conflicting interests at stake here, beginning with a precise appraisal of the ordinance as it affects communication.

*Id.* at 502–03, 101 S.Ct. at 2890 (citations omitted).

Plaintiff contends that § 16–28A.008 in particular contravenes the *Metromedia* holding. That section provides:

> The following signs shall *not* be required to obtain a permit:
>
> A. Any public notice or warning required by valid and applicable federal[,] state or local law, regulation or ordinance.
>
> B. Any sign inside a building.
>
> C. Holiday lights and holiday decorations with no commercial message.
>
> D. Flags bearing no commercial message.
>
> E. Campaign signs (*See* Section 16–28A.007(3)).
>
> F. Real estate signs (*See* Section 16–28A.007(10)).
>
> G. Incidental signs not exceeding thirty-five (35) square feet in sign area (*See* Section 16.28A.007(12)).
>
> H. Signs otherwise allowed within public rights-of-way pursuant to Section 16–28A.012, except for subsection 16–28A.012(1)(E) therein, which signs shall require a permit.
>
> I. Parking lot identification signs required by Sections 16–14.011(5), 16–15.010(5), 16–18A.012(5), 16–18B.012(5), 16–18C.012(5), and 16–18D.012(5) of this Part 16.

1994 Sign Ordinance at § 16–28A.008 (emphasis added). In order to erect a sign not itemized in the list of exceptions, one must obtain a permit from the City of Atlanta. Plaintiff argues that the provision of these exceptions to the permit requirement violates a central tenet of *Metromedia:* "With respect to noncommercial speech, the city may not choose the appropriate subjects for public discourse: 'To allow a government the choice of permissible subjects for public debate would be to allow that government control over the search for political truth.' " *Metromedia, supra,* at 515, 101 S.Ct. at 2896 (*quoting Consolidated Edison Co. v. Public Service Comm'n,* 447 U.S. 530, 538, 100 S.Ct. 2326, 2333, 65 L.Ed.2d 319 (1980)). While the quoted statement is certainly true as an axiom of constitutional law, it is not persuasive under the facts of the case *sub judice.*

The City of San Diego ordinance, which was deemed unconstitutional in *Metromedia,* also listed a number of types of noncommercial signs which were exempt from its ordinance. *See Metromedia, supra,* 453 U.S. at 495, 101 S.Ct. at 2886. For all intents and purposes, the list was identical to that included in the 1994 Sign Ordinance. However, there is one critical difference which plaintiff has overlooked. In the San Diego ordinance, *only* those signs conveying a noncommercial message itemized within the ordinance could be displayed. "No other noncommercial or ideological signs meeting the structural definitions [were] permitted, regardless of their effect on traffic safety or esthetics." *Id.* at 514, 101 S.Ct. at 2896. To the contrary, the Atlanta ordinance expressly provides that *any* noncommercial message may be displayed on a sign that meets the other requirements of the 1994 Sign Ordinance. The relevant section states:

> Any sign allowed herein may contain, in lieu of any other message or copy, any lawful noncommercial message that does not direct attention to a business operated for profit, or to a product, commodity or service for sale or lease, or to any other commercial interest or activity, so long as said sign complies with the size, height, area and other requirements of this Chapter and of Part 16 of the Code of Ordinances.

1994 Sign Ordinance at § 16–28A.007(g). This is a "savings clause" under the *Metromedia* holding, to the extent it cures the principal constitutional infirmity of that case, namely the selection of certain noncommercial messages based on their content for favorable treatment. Therefore, the 1994 Sign Ordinance is able to pass constitutional muster under the *Metromedia* standard.

■ Plaintiff's next challenge pursuant to the First Amendment concerns the case of *City of Ladue v. Gilleo,* — U.S. —, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994). The Supreme Court held that a municipal ordinance which proscribed the placing of almost all signs on residential property was a violation of the First Amendment. *Ladue, supra,* — U.S. at —, 114 S.Ct. at 2047. The very limited exceptions included residence identification signs, for sale signs, and signs warning of safety hazards. *Id.,* at —, 114 S.Ct. at 2039. The Court, rejecting the city's argument that the regulation was a valid "time, place and manner" restriction, emphasized the ease and cost effectiveness of residential signs as a means of communication, the particular force of a message displayed from one's own home, and the special treatment afforded to individual liberty in the home. *Id.,* at — - —, 114 S.Ct. at 2046–47.

Plaintiff argues that §§ 16–28A.010(1)(G), (2)(G), and (3)(G) of the 1994 Sign Ordinance violate *Ladue.* Those sections respectively proscribe general advertising signs in a number of residential zoning districts. At the outset, it must be noted that the *Ladue* Court acknowledged that all signs are not on equal footing before the mandates of the First Amendment. Qualifying the holding in that case, the Court stated that "[n]or do we hold that every kind of sign must be permitted in residential areas. Different considerations might well apply, for example, in the case of signs (whether political or otherwise) displayed by residents for a fee, or in the case of off-site commercial advertisements on residential property." *Ladue, supra,* — U.S. at — n. 16, 114 S.Ct. at 2046 n. 16. This point is significant in that the savings clause of the 1994 Sign Ordinance expressly provides that any noncommercial message may be placed on an otherwise qualifying sign on one's property. *See* 1994 Sign Ordinance at § 16–28A.007(g) (reproduced *supra* ). This savings clause, coupled with the exclusion of incidental signs (those signs offering a message secondary to the property's primary usage) not exceeding thirty-five feet from the permitting requirement,[3] allows a homeowner a broad range of discretion in the posting of noncommercial signs on his or her property. This is the very antithesis of the infringement on expression struck down in *Ladue.* Insofar as restrictions on general advertising signs of a commercial nature in residential zoning districts, it need hardly be stated that a municipal entity, pursuant to its power to enact zoning regulations, can likewise restrict the posting of commercial messages in those same districts. *See, e.g., Central Hudson, supra,* 447 U.S. at 562–63, 100 S.Ct. at 2350 ("The Constitution ... accords a lesser protection to commercial speech than to other constitutionally guaranteed expression."). Thus, plaintiff's facial challenge to the 1994 Sign Ordinance as violative of *Ladue* is without merit.

■ The third prong of plaintiff's First Amendment attack on the 1994 Sign Ordinance argues that the oversight authority granted to the Atlanta Urban Design Commission is an unconstitutional prior restraint of free speech. The prior restraint question can be disposed of with relative ease. Sections 16–28A.010(25)–(27) of the 1994 Sign Ordinance proscribe the erection of general advertising signs in certain "landmark" districts and require the issuance of a "Certificate of Appropriateness" in order to place *any* sign within these districts. In determining whether a "Certificate of Appropriateness" shall issue, the Urban Design Commission must consider the following criteria:

A. The size, scale and design of the sign shall be compatible with the size, scale and design of the property, building or site upon which it is to be located;

B. The sign's materials shall be compatible with the period and style of the property, building or site;

C. The sign's location shall not obscure any significant architectural features of the building or site; and

D. The sign's installation shall not irreparably damage any cornice, ornament or similar architectural detail and shall be the least damaging method feasible for the property, building or site.

1994 Sign Ordinance at § 16–28A.007(22). This regulation is merely a landmark preser-

3. *See* 1994 Sign Ordinance at § 16–28A.008(G).

vation law of the sort approved by the Supreme Court most notably in the case of *Penn Central Trans. Co. v. New York City,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978) (ruling on a Fifth Amendment "takings" issue). Though it is undisputed that "[a]ny system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity," *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 70, 83 S.Ct. 631, 639, 9 L.Ed.2d 584 (1963) (citations omitted), the challenged section simply does not provide for any such restraint on any expression. Rather, it is a decisively content-neutral set of considerations designed to maintain the historical integrity of certain neighborhoods, irrespective of the proposed content of the speech. In fact, the content of a proposed sign is not even a matter for the Commission's consideration.

■ Next, plaintiff maintains that the registration requirement for nonconforming general advertising signs violates both the First Amendment and the Equal Protection Clause of the United States Constitution. The operative section of the ordinance initially sets forth the city's basis for the registration requirement:

> A. The City finds that nonconforming general advertising signs may adversely affect the public health, safety and welfare. Such signs may adversely affect the aesthetic characteristics of the City and may adversely affect public safety due to the visual impact of signs on motorists and the structural characteristics of said signs. Accordingly, the following registration requirements are found to be necessary in order to minimize these possible adverse effects through yearly inspections and maintenance and allow the City to remain cognizant of the locations and maintenance of said signs.

1994 Sign Ordinance at § 16–28A.014(3)(A). In order to effectuate the City's stated purposes, the Ordinance goes on to provide:

> B. The owner(s) or authorized agent(s) of each nonconforming General Advertising Sign located within the City of Atlanta shall register said nonconforming sign with the Director of the Bureau of Buildings no later than six months after the effective date of this Chapter and shall renew this registration annually. Any nonconforming general advertising sign that does not comply with the registration requirements herein shall be subject to the regulations applicable to illegal signs and all other enforcement provisions specified in Section 16–28A.015. The Director shall promulgate a form for the registration of said nonconforming general advertising signs and shall annually inspect said signs to assure that they continue in all other respects in conformity with all other provisions of this Part and any other applicable ordinance or regulation of the City of Atlanta. The fee for initial regulations shall be $50.00. The fee for each subsequent renewal shall be $25.00. These fees represent those costs associated with the administrative compliance with these requirements and shall be used to offset those costs.

*Id.* at § 16–28A.014(3)(B).

In regard to the First Amendment issue, it is critical to recognize that the registration guidelines quoted verbatim above do not in any way attempt to regulate the content of speech. Rather, for a certain subset of all signs, i.e., nonconforming general advertising signs, a relatively small fee is imposed for the purpose of assuring compliance with clearly delineated governmental purposes. Notwithstanding plaintiff's cursory allegations that the registration scheme fails to meet the governing test set forth in the *Central Hudson* case, supra, the court is satisfied that defendant has met the burden of demonstrating compliance. *See, e.g., Bolger v. Youngs Drug Products Corp.,* 463 U.S. 60, 71 n. 20, 103 S.Ct. 2875, 2883 n. 20, 77 L.Ed.2d 469 (1983) ("The party seeking to uphold a restriction on commercial speech carries the burden of justifying it."). Inasmuch as there is no question that plaintiff is concerned with legal speech, *Central Hudson* requires defendant to satisfy three requirements: demonstration of a substantial government interest, that the regulation advances that interest, and that the regulation is not more extensive than necessary to serve

that interest. *Central Hudson, supra,* 447 U.S. at 566, 100 S.Ct. at 2351.

The City of Atlanta has articulated more than one public interest at stake. First, due to the construction of billboards, the principal outdoor advertising medium, the city has a direct public safety interest in being sure that the support mechanism is structurally sound and is not likely to injure any person or property. Second, because these signs are by definition not in conformance with current zoning regulations, the city has an interest in knowing their location. These interests are directly advanced by mandating the registration of these signs. This satisfies the second requirement of *Central Hudson.* A simple registration requirement provides the city with the necessary information to be able to monitor the safety features of the signs and to promptly respond to any public complaints. The final requirement, gauging whether the regulation goes no further than necessary, is also met. A minor fee is imposed on the owners of the nonconforming signs so as to finance the city's ability to enforce the regulation. The fee is relatively nominal and bears no relation to the content of the billboard.[4] This is a straight administrative fee. Plaintiff's efforts to portray this as a targeted tax meant to burden particular forms of expression, a revenue raising mechanism deemed unconstitutional in *Arkansas Writers' Project, Inc. v. Ragland,* 481 U.S. 221, 107 S.Ct. 1722, 95 L.Ed.2d 209 (1987), is not supported by the facts.

Plaintiff's equal protection argument as to the registration requirement is also unpersuasive. To the extent that the court has rejected plaintiff's First Amendment challenge to the registration requirement, it is possible to analyze this claim under the far less stringent equal protection analysis employed in cases of economic regulation, as opposed to the more onerous strict scrutiny applied to fundamental rights such as free speech. That said, it is not necessary to apply an independent equal protection test. The Supreme Court has held that "[i]f there is a sufficient 'fit' between the legislature's means and ends to satisfy the concerns of the First Amendment, the same 'fit' is surely adequate under the applicable 'rational basis' equal protection analysis." *Posadas de Puerto Rico Assoc. v. Tourism Co.,* 478 U.S. 328, 344 n. 9, 106 S.Ct. 2968, 2978 n. 9, 92 L.Ed.2d 266 (1986). *See also Don's Porta Signs, Inc. v. City of Clearwater,* 829 F.2d 1051, 1054 n. 10 (11th Cir.1987) ("Because the regulation passes muster on the *Central Hudson* test, the Plaintiff's claims that the regulation violates the equal protection clause by discriminating between types of signs fails as well.").

Plaintiff's final federal constitutional argument is that in restricting general advertising signs to only I–1 (light industrial) and I–2 (heavy industrial) zoning districts, the 1994 Sign Ordinance violates the First and Fourteenth Amendments. The parties are in agreement that the governing standard is that set forth in the *Central Hudson* case, *supra,* and discussed earlier in this order. In light of the court's earlier discussions, it is not necessary to fully reiterate the *Central Hudson* standard. Rather, the remainder of this section will be confined to discussing that standard's applicability to the zoning limitation.

At the outset, it should once again be noted that the legality of plaintiff's putative expression is not at issue, and thus the first prong of *Central Hudson* (that the speech concern lawful activity and not be misleading) is deemed satisfied. In regard to the second prong (the substantiality of the governmental interest) and the fourth prong (the extent and breadth of the regulation), the application of the *Central Hudson* standard by the *Metromedia* court is directly on point.

> [T]here [cannot] be substantial doubt that the twin goals that the ordinance seeks to further—traffic safety and the appearance of the city—are substantial governmental

4. This is qualitatively different than the fee assessment plan held unconstitutional in *Forsyth County, Georgia v. Nationalist Movement,* 505 U.S. 123, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992). In that case, the Supreme Court held that the ordinance at issue was unconstitutional because it required that an administrator, in assessing the security costs of a proposed parade, had to consider the content of the expression involved and estimate the public response thereto.

goals. It is far too late to contend otherwise with respect to either traffic safety, *Railway Express Agency, Inc. v. New York,* 336 U.S. 106 [69 S.Ct. 463, 93 L.Ed. 533] (1949), or esthetics, *see Penn Central Transportation Co. v. New York City,* 438 U.S. 104 [98 S.Ct. 2646, 57 L.Ed.2d 631] (1978); *Village of Belle Terre v. Boraas,* 416 U.S. 1 [94 S.Ct. 1536, 39 L.Ed.2d 797] (1974); *Berman v. Parker,* 348 U.S. 26, 33 [75 S.Ct. 98, 102–03, 99 L.Ed. 27] (1954). Similarly, we reject [plaintiff's] claim that the ordinance is broader than necessary and, therefore, fails the fourth part of the *Central Hudson* test. If the city has a sufficient basis for believing that billboards are traffic hazards and are unattractive, then obviously the most direct and perhaps the only effective approach to solving the problems they create is to prohibit them. The city has gone no further than necessary in seeking to meet its ends. Indeed, it has stopped short of fully accomplishing its ends: It has not prohibited all billboards, but allows onsite advertising and some other specifically exempted signs.

*Metromedia, supra,* 453 U.S. at 507–08, 101 S.Ct. at 2892–93. This statement could easily have been rendered in interpreting the 1994 Sign Ordinance. Atlanta's basis for enacting this regulation is set forth in great detail in § 16–28A.003 of the 1994 Sign Ordinance under the caption "Findings, purpose and intent." In general terms, these can be categorized as traffic, safety, and aesthetic purposes, all of which have received the Supreme Court's approval. For a number of reasons, primarily aesthetics and the quality and quantity of pedestrian and motor traffic, the City of Atlanta has determined that the limitation of off-premises general advertising signs to industrial zones will accomplish these goals. It can hardly be said that this determination is so arbitrary as to necessitate invalidation on First Amendment grounds.

In regard to the final (third) prong of *Central Hudson,* whether the 1994 Sign Ordinance advances the city's interests, the city's determination of how to reach this goal in the case at bar is not so far flung as to warrant judicial intervention in what is an area best suited to resolution through a local legislative process. On this point, the *Metromedia* court is particularly instructive.

> We likewise hesitate to disagree with the accumulated, commonsense judgment of local lawmakers and of the many reviewing courts that billboards are real and substantial hazards to traffic safety. There is nothing here to suggest that these judgments are unreasonable.

*Metromedia, supra,* 453 U.S. at 509, 101 S.Ct. at 2893. The fact that the City of Atlanta has elected not to ban all billboards—an act within its province—does not require that the opposite extreme be chosen. The First Amendment clearly bars a city from selecting certain modes of communication for preferential treatment based on their content. It does not, though, prevent a city from enacting content-neutral zoning requirements intended to further goals wholly unrelated to speech, such as traffic safety and the visual appeal of the city. Once again, *Metromedia* lends support to this type of regulation:

> In the first place, whether onsite advertising is permitted or not, the prohibition of offsite advertising is directly related to the stated objectives of traffic safety and esthetics. This is not altered by the fact that the ordinance is underinclusive because it permits onsite advertising. Second, the city may believe that offsite advertising, with its periodically changing content, presents a more acute problem than does onsite advertising. Third, [the city] has obviously chosen to value one kind of commercial speech—onsite advertising—more than another kind of commercial speech—offsite advertising. The ordinance reflects a decision by the city that the former interest, but not the latter, is stronger than the city's interests in traffic and esthetics. The city has decided that in a limited instance—onsite commercial advertising—its interests should yield.... It does not follow from the fact that the city has concluded that some commercial interests outweigh its municipal interests in this context that it must give similar weight to all other commercial advertising. Thus, offsite commercial billboards may be pro-

hibited while onsite commercial billboards are permitted.

*Metromedia, supra,* 453 U.S. at 511–12, 101 S.Ct. at 2894–95. Therefore, plaintiff's First Amendment challenge to the 1994 Sign Ordinance based on the limitation of general advertising signs to industrial zones cannot succeed.

Insofar as an equal protection argument is concerned, it too must fail for reasons discussed in regard to the registration requirement. As noted, the Supreme Court has held that "[i]f there is a sufficient 'fit' between the legislature's means and ends to satisfy the concerns of the First Amendment, the same 'fit' is surely adequate under the applicable 'rational basis' equal protection analysis." *Posadas de Puerto Rico Assoc. v. Tourism Co.,* 478 U.S. 328, 344 n. 9, 106 S.Ct. 2968, 2978 n. 9, 92 L.Ed.2d 266 (1986).

B. *Georgia Law Issues*

First, it should be noted that plaintiff raises virtually all of the same constitutional claims regarding the 1994 Sign Ordinance under the Georgia counterparts of the First Amendment and Equal Protection Clause. However, because plaintiff does not argue these points separately in its trial brief, the court assumes that it is relying on the federal law-based arguments. Even if that were not the case though, based on the foregoing discussion, the court finds that the 1994 Sign Ordinance does not violate either GA. CONST. art. I, § 1, ¶ 2 (equal protection) or GA. CONST. art. I, § 1, ¶ 5 (free speech). Two other state law issues remain for consideration.

Plaintiff argues that the 1994 Sign Ordinance illegally delegates authority to the Atlanta Urban Design Commission in its oversight capacity vis-a-vis signs in "landmark" districts. The basis of this challenge is that the 1994 Sign Ordinance allegedly delegates to this unelected body the authority to determine which signs may be placed in the "landmark" districts. This argument simply does not comport with the language and purpose of the statute. Section 16–28A.007(22), *supra,* has four criteria promulgated by the City Council, which the Urban Design Commission is empowered to apply. Thus, the Commission's *sole* function in this regard is to apply these criteria. If an applicant meets the standards, permission is granted; if they do not, permission is denied. This does not violate GA. CONST. art. IX, § 2, ¶ 4. It is clear that "[d]elegation of legislative discretion in zoning matters would ... prove to be an unconstitutional act." *Button Gwinnett Landfill v. Gwinnett County,* 256 Ga. 818, 819, 353 S.E.2d 328 (1987). However, under the 1994 Sign Ordinance the Urban Design Commission "simply determines whether an applicant's [sign] strictly complies with the conditions that the governing authority has specified." *Id.* at 820, 353 S.E.2d 328. This is not tantamount to a delegation of legislative power.

Plaintiff's complaint also contends that the 1994 Sign Ordinance violates the Due Process Clauses of the United States and Georgia Constitutions in its efforts to protect trees. The section at issue provides:

> No removal, destruction, topping, pruning or cutting of any trunk, branch, roots or other vital section of any tree shall be allowed, whether or not such tree may interfere with the visibility of or otherwise affect a sign, without a permit obtained from the City Arborist. In deciding whether or not to issue such permit, the City Arborist shall consider the following factors:
>
> A. Conformance with the City of Atlanta Tree Ordinance;
>
> B. Whether the tree(s) involved are historic or specimen trees;
>
> C. The degree to which the proposed cutting or pruning is likely to damage the trees; and
>
> D. The impact of the proposed pruning on Atlanta's urban forest environment.

1994 Sign Ordinance at § 16–28A.007(14). The City of Atlanta Tree Ordinance is a comprehensive regulatory scheme detailing procedures and standards for the removal and/or destruction of trees. Plaintiff argues that this section of the 1994 Sign Ordinance does not pass muster under due process analysis because it does not provide sufficient guidelines for the City Arborist to follow. The court disagrees. Coupled with the 1994

Sign Ordinance, the City of Atlanta Tree Ordinance satisfies the due process standards under both constitutions. Because there is no issue of free speech here, the standard applied to commercial statutes—as opposed to that used in areas of criminal procedure or fundamental rights—is controlling. "[T]he standard of review with regard to commercial statutes is a very lenient one. Such statutes are impermissibly vague only if they provide 'no rule or standard at all.'" *Cotton States Mutual Insur. Co. v. Anderson,* 749 F.2d 663, 669 (11th Cir.1984) (*quoting Exxon Corp. v. Busbee,* 644 F.2d 1030, 1033 (5th Cir.), *cert. denied,* 454 U.S. 932, 102 S.Ct. 430, 70 L.Ed.2d 239 (1981) (citations omitted)). "'Uncertainty ... is not enough for the [commercial regulatory statute] to be unconstitutionally vague; rather, it must be substantially incomprehensible.'" *Id.* (alteration in the original). The 1994 Sign Ordinance clearly satisfies this test.

The due process standard under the Georgia Constitution is virtually identical. The test is "whether the ordinance in question is drawn with sufficient specificity to appraise an applicant of common intelligence of the standards which he should anticipate the governing body will consider." *Levendis v. Cobb County,* 242 Ga. 592, 594, 250 S.E.2d 460 (1978). As with the federal standard, the 1994 Sign Ordinance clearly satisfies this test.

C. *Linkage of the 1994 Sign Ordinance and the Olympic Sign Ordinance*

Plaintiff endeavors to link the two ordinances together, with the hope that if one is deemed unconstitutional, the other must fall as the result of this determination. Simply put, this linkage is not supported by either fact or law.

In terms of the facts, plaintiff's primary argument is that the two ordinances were enacted within two months of each other. This fact alone, however, proves nothing. There is no evidence to support plaintiff's allegation that the combined force of *both* ordinances was designed to regulate the content of messages to be placed on signs during the Olympic games. First, the 1994 Sign Ordinance is a comprehensive regulatory scheme which deals with all signs throughout the City of Atlanta. It is neither temporally limited to the period surrounding the Olympic games nor geographically restricted to the numerous Olympic venues. In fact, the 1994 Sign Ordinance itself does not even refer to the 1996 Olympic games. Second, § 10 of the Olympic Sign Ordinance expressly sets forth its severability and independence from all other provisions in the Code of Ordinances of the City of Atlanta. It further states: "Should any section of this ordinance be declared by a Court of competent jurisdiction to be invalid, said decision shall not affect the validity of other remaining provisions of this ordinance, nor shall said decision affect the validity of any other provision of the Code of Ordinances." Olympic Sign Ordinance at § 10.

In terms of legal arguments, the majority of plaintiff's brief on this issue deals with the possibility of severing an unconstitutional portion of the 1994 Sign Ordinance from the remainder of the 1994 Sign Ordinance. That issue need not be addressed since this court has not found any legal violations, constitutional or otherwise, in the 1994 Sign Ordinance. Plaintiff correctly cites the seminal Georgia case on the issue of severability. The Supreme Court of Georgia, over a century ago, held that "when a statute cannot be sustained as a whole, the courts will uphold it in part when it is reasonably certain that to do so will correspond with the main purpose which the legislature sought to accomplish by its enactment, if, after the objectionable part is stricken, enough remains to accomplish that purpose." *Elliott v. State,* 91 Ga. 694, 696, 17 S.E. 1004 (1893). "But if the objectionable part is so connected with the general scope of the statute that, should it be stricken out, effect cannot be given to the legislative intent, the rest of the statute must fall with it." *Id.* Applying that standard to the case *sub judice,* it is evident that the constitutional status of the Olympic Sign Ordinance has no bearing whatsoever on the viability of the 1994 Sign Ordinance. The court finds, as a matter of law, that there is no symbiotic relationship, and thus no legal linkage, between the two ordinances.

*CONCLUSION*

After careful consideration of both fact and law, the court finds as follows. The Olympic Sign Ordinance violates the First Amendment of the United States Constitution, and thus the City of Atlanta is permanently enjoined from enforcing it. The 1994 Sign Ordinance withstands legal scrutiny, and therefore the temporary restraining order entered by this court on January 26, 1995, and continued on February 24, 1995, is hereby dissolved.

IT IS SO ORDERED.